UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                         Case No. 11-44391

STEPHANIE M. HOWIE-COX,                        Chapter 13

                        Debtor.                Judge Thomas J. Tucker
_____/

PAMELA M. DOYLE,

                  Plaintiff,
v.                                             Adv. Pro. No. 11-5628

STEPHANIE M. HOWIE-COX,

                  Defendant.
_____/

## TRIAL OPINION

### I. Introduction

In this adversary proceeding, Plaintiff Pamela M. Doyle ("Doyle") seeks a judgment

against the Chapter 7 debtor Stephanie M. Howie-Cox ("Howie-Cox"), for $133,961.61 plus

costs, interest, and attorney fees, and seeks a determination that this debt is nondischargeable in

Howie-Cox's Chapter 7 case, under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). In

addition, Doyle seeks a denial of Howie-Cox's discharge under 11 U.S.C. §§ 727(a)(4)(A) and

727(a)(5). The Court held a bench trial and took the matter under advisement. The Court has

considered all of the arguments and evidence presented by the parties at trial. This opinion states

the Court's findings of fact and conclusions of law.

For the reasons stated in this opinion, the Court finds for Defendant Howie-Cox on all of

Plaintiff Doyle's claims, and will enter judgment accordingly.

## II. Background and facts

### A. The relationship between the parties

Defendant Howie-Cox is the niece of Plaintiff Doyle.[1]  For many years, these two had a very close relationship, which they both describe as like that of a mother and daughter.[2]  Doyle was the beneficiary of a large inheritance — in the range of $850,000 to $1 million — from her uncle, Jim Hadyniak.[3]  Doyle often gave Howie-Cox, and Howie-Cox's husband, Jerry Cox, and the couple's two children, expensive gifts, and often baby-sat for the couple's children free of charge.[4]

But the relationship between Howie-Cox and Doyle ended abruptly, when Howie-Cox discovered that Doyle, who was also married with children, had been having a sexual relationship with Howie-Cox's husband Jerry Cox for about eighteen months.[5]  The discovery of the affair between Doyle and Howie-Cox's husband was followed by the divorce of Doyle from her husband, Bruce Doyle; a bitter split between Howie-Cox and Doyle;[6] the estrangement of

---

[1] Howie-Cox is the daughter of Doyle's oldest sister, Sharon Howie.  (Tr., Docket # 107)(Testimony of Doyle) at 20.)

[2] *See* Tr., Docket # 107 (Testimony of Doyle) at 111; Tr., Docket # 113 (Testimony of Howie-Cox) at 94-95, 109, 148-149, Tr., Docket # 118 at 109.

[3] Tr., Docket # 107 (Testimony of Doyle) at 93-95.

[4] Tr., Docket # 107 (Testimony of Doyle) at 76-77; Tr., Docket # 118 (Testimony of Jerry Cox) at 53(free babysitting), 54 (gifts of "cabinets, sink, stuff of that nature" for the Crossman Property), 56 (gifts of toys bought for the children "all the time"), 72-73 (cell phone and $3,500.00, 27-foot camper for Jerry Cox); Tr., Docket # 113 (Testimony of Howie-Cox) at 80-81, 122 (Christmas gift of "all the cabinets for the house" worth approximately "[$5,000] to $6,000"), 101-102 (gifts for herself and other members of her family).

[5] *See* Tr., Docket # 107 (Testimony of Doyle) at 129.

[6] Howie-Cox testified that she does not want to talk to Doyle or "to have interactions with her at all."  Tr., Docket # 113 (Testimony of Howie-Cox) at 95.

Doyle from Howie-Cox's other family members;[7] and eventually, the divorce of Howie-Cox from her husband.[8]

### B. The transactions giving rise to the dispute

The dispute in this adversary proceeding arises out a series of transactions between Howie-Cox and Doyle, which occurred during happier times. The parties agree that the following five transactions occurred:[9]

- On September 19, 2002, Doyle transferred $12,000.00 to Howie-Cox by check ("Transaction 1").[10]

- On September 26, 2002, Doyle transferred $2,000.00 to Howie-Cox by check ("Transaction 2").[11]

- On March 29, 2004, Doyle transferred $49,961.61 to Howie-Cox, for the remaining balance of the purchase price of a home located at 10390 Crossman, Romulus, Michigan (the "Crossman Property"), which was deeded to Doyle and Howie-Cox as "joint tenants with full right of survivorship" ("Transaction 3"). The deed was drafted by an attorney hired by and representing Doyle, and was done according to her directions. Howie-Cox was not represented by an attorney in this transaction. The deed for the purchase of the Crossman Property was recorded in April 2004. Immediately after the purchase, there was no mortgage or other lien on the Crossman Property.[12]

---

[7] *See* Tr., Docket # 107 (Testimony of Doyle) at 66.

[8] *See* DX-A (Judgment of Divorce between Howie-Cox and Jerry Cox). In this opinion, Plaintiff's trial exhibits will be cited as "PX-_"; Defendant's trial exhibits will be cited as "DX-_"; and joint trial exhibits will be cited as "JX-_."

[9] These five transactions will collectively be referred to in this opinion as "the Transactions."

[10] JX-AA; Final Pretrial Or. (Docket # 91) at 9 ¶ 4(A) (stipulated facts).

[11] JX-BB; Final Pretrial Or. (Docket # 91) at 9 ¶ 4(A) (stipulated facts).

[12] PX-1 (Check in the amount of $49,961.61 issued by Comerica Bank to Doyle); JX-CC (Conservator Deed); Final Pretrial Or. (Docket # 91) at 9 ¶ 4(B) (stipulated facts); Tr., Docket # 118 at 108, 109; Tr., Docket # 107 (Testimony of Doyle) at 111-112.

- On July 26, 2005, Doyle consented to, and executed, a mortgage of the Crossman Property along with Howie-Cox and her husband, to secure a promissory note in the amount of $70,000.00 to Quicken Loans, Inc. (the "First Mortgage").[13] Although the "Borrower" was defined on the First Mortgage to be Doyle, Howie-Cox, and Jerry Cox,[14] only Howie-Cox was a "Borrower" and signer on the promissory note.[15] Of the proceeds from the $70,000.00 borrowed, $7,144.00 was disbursed to pay balances on three of Howie-Cox's credit cards, and $57,785.08 was disbursed by check made payable to Doyle and Howie-Cox.[16] Howie-Cox received all of the funds from the check.

- On June 6, 2006, the Crossman Property was mortgaged again, to secure a promissory note in the amount of $105,750.00 (the "Second Mortgage").[17] The Lender on the Second Mortgage was Quicken Loans, Inc., and the mortgage defined the "Borrower" to be Doyle, Howie-Cox, and Jerry Cox.[18] Of the proceeds from the $105,750.00 borrowed, $16,152.00 was disbursed to pay the balances on five of Howie-Cox's credit cards; $69,955.54 was disbursed to "Countrywide" to pay off the previous First Mortgage, and $13,524.60 was disbursed by check made payable to Doyle and Howie-Cox.[19] Howie-Cox received all of the funds from the check.

## C. The affair between Doyle and Jerry Cox and its aftermath

The affair between Doyle and Jerry Cox began before the First Mortgage was signed in July 2005. The affair ended in 2006, either (according to Doyle) immediately before the Second Mortgage was signed, or (according to Jerry Cox) sometime after that, but in any event before

---

[13] JX-EE (First Mortgage); DX-C (unsigned promissory note in the amount of $70,000.00, with Howie-Cox as the Borrower and Quicken Loans Inc. as the Lender).

[14] JX-EE (First Mortgage).

[15] DX-C at 3.

[16] *See* JX-FF (Settlement Statement); PX-32 (check). The Court notes that the Settlement Statement states that $57,795.14 was disbursed to the "Borrower." However, the check amount at PX-32 is for $57,785.08.

[17] JX-GG (Second Mortgage).

[18] *Id.* No copy of the promissory note for this loan was presented in evidence.

[19] *See* JX-HH (Settlement Statement)(showing "Disbursements to Borrower" of $13,527.60); PX-26 (page 2 only) (check in the amount of $13,524.60).

4

August 8, 2006.[20]  Sometime after all of the five Transactions listed above, and after the affair

ended, Howie-Cox learned of the affair, and she ended all communication with Doyle.[21]

On November 3, 2009, Howie-Cox filed a verified complaint for divorce against Jerry

Cox, seeking a divorce and "an Ex Parte Order allowing [Howie-Cox] to take the children and

vacate the marital home (the Crossman Property), while awarding her the temporary physical

custody" of the children until the divorce was complete, due to domestic violence she allegedly

had suffered on numerous occasions at the hands of Jerry Cox.[22]  In her complaint for divorce,

Howie-Cox alleged, in relevant part regarding the Crossman Property, under the caption

"Property Division": "[Howie-Cox and Jerry Cox] have a marital home that was purchased as a

gift for them from [Howie-Cox's] aunt.  The title is in [Howie-Cox's] and her aunt's name only.

The parties have since mortgaged and subsequently refinanced the home."[23]  Howie-Cox left the

marital home after filing her complaint for divorce, and stopped making payments on the Second

---

[20] *See* Tr. , Docket # 118 (Testimony of Jerry Cox) at 62; Tr., Docket # 107 (Testimony of Doyle) at 126, 129.  Jerry Cox and Doyle disagree as to when their affair ended.  Jerry Cox testified that it ended a while *after* the Second Mortgage was signed on the Crossman Property. (Tr., Docket # 118 (Testimony of Jerry Cox) at 71.)  Doyle testified that it ended in Spring of 2006, *immediately before* the signing of the Second Mortgage of the Crossman Property.  (Tr., Docket # 107 (Testimony of Doyle) at 126-127.)

[21] Tr., Docket # 113 (Testimony of Howie-Cox) at 63, 95.  Howie-Cox testified that she began hearing rumors about the affair at the end of June or in early July 2006.  (Tr., Docket # 113 (Testimony of Howie-Cox) at 63.)

[22] *See* "Verified Complaint for Divorce and Request for Ex Parte Mutual Injunctive Order and Ex Parte Order Regarding Moving From Marital Home Temporary Custody, Parenting Time and Payment of the Bills" (PX-34).  Howie-Cox testified that she filed the complaint for divorce for two purposes: "To get me out of the house and start the divorce."  Tr. , Docket # 113 (Testimony of Howie-Cox) at 155.

[23] PX-34 at 8.

Mortgage on the Crossman Property. As a result of her nonpayment of the Second Mortgage, foreclosure proceedings were commenced against the Crossman Property.[24]

On May 20, 2010, a judgment of divorce was entered between Howie-Cox and Jerry Cox.[25] The judgment provided, with regard to the Crossman Property, under the caption "Property Division Marital Home":

> The marital home located at 10390 Crossman Street Romulus, MI 48174, is currently in foreclosure. The home is hereby awarded to Plaintiff, STEPHANIE COX, and she is solely awarded any equity in the home and/or shall be responsible for any debt on said property, as Defendant [Jerry Cox] is not listed on the mortgage. Defendant [Jerry Cox] may continue to live in the home throughout the foreclosure process, but shall be responsible to keep current all the taxes and insurance on the home until he vacates the marital home.[26]

On June 17, 2010, the Crossman Property was sold at a mortgage foreclosure sale.[27] The property was not redeemed from the foreclosure sale, and so Howie-Cox and Doyle lost all ownership interests they had in the Crossman Property.[28]

On February 22, 2011, Howie-Cox filed her voluntary petition for relief under Chapter 7.

---

[24] Tr., Docket # 113 (Testimony of Howie-Cox) at 41.

[25] DX-A. Although the Judgment of Divorce is stamped that it was entered on May 20, 2009, it must have actually been entered on May 20, 2010. The Judgment of Divorce recites, in relevant part, on the first page, that "the parties . . . placed the settlement on the record on March 4, 2010." Also, the complaint for divorce was not even filed until November 3, 2009. Finally, Howie-Cox testified that she and Jerry Cox "were divorced in May of 2010." (Tr., Docket # 113 (Testimony of Howie-Cox) at 146 ln. 7.)

[26] DX-A ("Judgment of Divorce") at 11.

[27] JX-DD ("Sheriff's Deed on Mortgage Foreclosure"); Tr., Docket # 113 (Testimony of Howie-Cox) at 41.

[28] Tr., Docket # 113 (Testimony of Howie-Cox) at 42.

**D.  The adversary proceeding**

On May 23, 2011, Doyle filed a complaint against Howie-Cox commencing this adversary proceeding.[29]   Doyle later filed an amended complaint.[30]

## III.  Jurisdiction

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J).  This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b).  Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings.  *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009).  This matter is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *id.*, namely, the subsection of Bankruptcy Code sections 523(a) and 727(a) relied on by Doyle. And this matter is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *Id.*

Because this case involves the dischargeability of alleged and disputed debts under § 523(a), this Court has constitutional authority to enter a final judgment determining the "validity and amount" of such disputed debts, notwithstanding *Stern v. Marshall*, 564 U.S. ___, 131 S.Ct. 2594 (2011).  *See Hart v. Southern Heritage Bank* (*In re Hart*), ___ Fed.Appx. ___,

---

[29] Docket # 1.

[30] Docket # 37.

2014 WL 1663029 (6th Cir., April 28, 2014) at *2 (citing *Longo v. McClaren* (*In re McLaren*), 3 F.3d 958, 965 (6th Cir. 1993)).

## IV. Discussion

The primary dispute in this adversary proceeding concerns the five Transactions between Doyle and Howie Cox, listed in Part II.B of this opinion.   Although the parties agree that the Transactions occurred, they disagree on the nature of, and certain facts regarding, each of the Transactions.

### A. Doyle's position regarding the Transactions

Doyle alleges that Transaction 1 ($12,000.00), Transaction 2 ($2,000.00) and Transaction 3 ($49,961.61) were all *loans* from Doyle, which Howie-Cox promised to repay after she completed her education and obtained a full-time job.[31]   Doyle claims that she made the first loan for $12,000.00 (Transaction 1) after Howie-Cox left a note at Doyle's home asking to borrow the money, "to get rid of some debt that was owed to relieve some of her stress so she could concentrate on school."[32]   Doyle claims that she made the second loan for $2,000.00 (Transaction 2) a few days after the first loan, when Howie-Cox told her that the $12,000.00 she previously loaned Howie-Cox did not cover all of Howie-Cox's debts and expenditures, and Howie-Cox asked to borrow more money.[33]   Doyle claims that she made the third loan of $49,961.61 (Transaction 3) after both Howie-Cox's mother and Howie-Cox asked Doyle to lend

---

[31] Tr., Docket # 107 (Testimony of Doyle regarding Transaction 1) at 21-22, 29; (Testimony of Doyle regarding Transaction 2) 29-30;  (Testimony of Doyle regarding Transaction 3) at 30-38.

[32] *Id.* at 21.

[33] *Id.* at 29-30.

Howie-Cox the money needed to purchase the Crossman Property for $50,000.00 in cash.[34] Doyle alleges that she hired an attorney to draft the deed for the Crossman Property in her name and Howie-Cox's name, as "joint tenants with full right of survivorship," as security for the repayment of the loan.[35]

Regarding the fourth Transaction — the First Mortgage, Doyle alleges that she consented to the First Mortgage of the Crossman Property in the amount of $70,000.00 based on the representation by Howie-Cox that she would use the proceeds of that mortgage loan to repay all of the loans Doyle had made to Howie-Cox (Transactions 1-3).[36] Doyle testified that she received none of the proceeds of the check for $57,785.08 disbursed on account of the First Mortgage, and does not know how Howie-Cox obtained those funds.[37] Although the check for that amount was made payable to both Doyle and Howie-Cox, and the cancelled check has two endorsement signatures on it purporting to be those of Doyle and Howie-Cox, Doyle testified that she never endorsed that check.[38]

Regarding the fifth Transaction — the Second Mortgage, Doyle alleges that she never consented to the Second Mortgage. She says that she appeared for a closing of the Second Mortgage loan after Howie-Cox summoned her to the closing at the Crossman home, and represented that the purpose was to refinance the First Mortgage, in order to obtain a fixed rate

---

[34] *Id.* at 30-31.

[35] *Id.* at 34-35.

[36] Am. Compl. (Docket # 37) at 2 ¶¶ 11-12; Tr., Docket # 107 (Testimony of Doyle regarding First Mortgage) at 39.

[37] Tr., Docket # 107 (Testimony of Doyle regarding First Mortgage) at 39, 44, 49.

[38] *See* PX-32 (check); Tr., Docket # 107 (Testimony of Doyle regarding First Mortgage) at 48.

9

mortgage in place of the flexible rate First Mortgage. But Doyle testified that she left the loan

closing without signing the Second Mortgage, after reading the paperwork and learning that the

new mortgage loan amount was $105,750.00 — much more than was necessary to pay off the

First Mortgage.[39] Doyle further claims that her signature was then forged on the Second

Mortgage;[40] that she was unaware that the $13,524.60 check for the net proceeds had been issued,

and that she never received any proceeds from the Second Mortgage loan.[41]

Doyle testified that she did not request repayment of any of the alleged loans she made to

Howie-Cox "right away" because she knew Howie-Cox didn't have the money. But, she says,

"[a]fter everything else that was taking place" she requested repayment.[42] Doyle testified further

that on the occasions she requested repayment of the loans, Howie-Cox told her that she didn't

have the money.[43] Doyle testified further that she also spoke to Howie-Cox's mother and Jerry

Cox about repayment of the loans.[44]

## B. Howie-Cox's position regarding the Transactions

Contrary to Doyle's version of events, Howie-Cox testified that Transactions 1-3 were all

*gifts* from Doyle to herself, not loans; that she never promised to pay back any of the money

---

[39] Tr., Docket # 107 (Testimony of Doyle regarding Second Mortgage) at 53.

[40] *See* Am. Compl. (Docket # 37) at 3 ¶¶ 18-19, 21; Tr., Docket # 107 (Testimony of Doyle regarding Second Mortgage) at 58.

[41] Tr., Docket # 107 (Testimony of Doyle regarding Second Mortgage) at 55, 56; *see also* JX-GG (Second Mortgage).

[42] Tr., Docket # 107 (Testimony of Doyle) at 29 (regarding $12,000.00 purported loan), 30 (regarding $2,000.00 purported loan), 37-38 (regarding $49,961.61 purported loan).

[43] *Id.* at 29, 37-38.

[44] *Id.* at 29.

given to her by Doyle; that she never had any intention of paying back any of that money; and that she never repaid any of the money to Doyle.[45]  Regarding Transaction 1, Howie-Cox denies that she wrote a note asking Doyle to borrow $12,000.00.[46]  Regarding Transaction 3, Howie-Cox denies that Doyle's name was placed on the deed as security for the repayment of the $70,000.00 Doyle provided in Transaction 3.[47]  And Howie-Cox testified that before Doyle filed this adversary proceeding, Doyle had never asked her to repay any of the money she had given to her in Transactions 1-3.[48]

Regarding the $70,000 First Mortgage loan on the Crossman Property, Howie-Cox denied that she ever told Doyle that the reason for the First Mortgage was so that she could repay the money purportedly lent to Howie-Cox from Doyle, and denied that she owed any money to Doyle.  Howie-Cox denied that there was any agreement to pay any of the proceeds of the First Mortgage loan to Doyle.[49]  According to Howie-Cox, the purpose of the First Mortgage was to enable Howie-Cox and her husband to repay some of the debt they had incurred in making improvements to the Crossman Property to make it habitable, and to make further improvements to the Property.[50]  Howie-Cox also denied forging Doyle's name on the loan proceeds check for

---

[45]  Tr., Docket # 118 at 106 (regarding Transaction 1 in the amount of $12,000.00); 107 (regarding Transaction 2 in the amount of $2,000.00); 107-109 (regarding Transaction 3 in the amount of $49,961.61).

[46]  Tr., Docket # 113 (Testimony of Howie-Cox) at 100-101.

[47]  Tr., Docket # 118 at 108-109.

[48]  Tr., Docket # 113 (Testimony of Howie-Cox) at 107-108.

[49]  *Id*. at 113.

[50]  *Id*. at 113-114, 157-158, 104, 164-165.  Howie-Cox's testimony about the condition of the home was as follows:

$57,785.08, which was mailed by the lender to the Crossman Property after the closing on the First Mortgage.[51]  Howie-Cox testified that when she received that check, she telephoned Doyle to tell her it was there, Doyle came to the Crossman Property, and they both endorsed the check in the driveway.[52]

---

Q Why would it have to be gutted?
A It did not have a furnace. It did not have ductwork to install a furnace. There was mold on -- in the bathroom. The plumbing wasn't working right. There were also other issues with -- the floor was sloped, and there were issues with water leaking in from the roof, so, no, it was not -- it was not salvageable, and it needed to be completely gutted.

Q In addition to being not salvageable in terms of major work, but then you did some more or less upgrades to the property as well.
A Yes. The siding was very old, and once we removed the siding to the house, it was part of the original house, so parts of the house needed to be reframed because when they were going to hang the siding, they weren't able to.

Q Okay. Well, it also needed kitchen cabinets.
A It needed kitchen cabinets and floors.

Q And floors. Were actually like walls being removed?
A There were no walls. It was down to the studs. The electric was cotton wiring, and when our electrician came in and saw it, he actually asked us if it would be okay if he called people that he worked with because they had never seen it in a house, and they took pictures of it, so it was rewired, replumbed. Some of the studs, the framing, the two-by-fours, whatever they're called, needed to be replaced. They were warped. When we did remove the kitchen cabinets to try to save them is when we found out that there was a leak down an entire wall from the roof. Nothing -- everything that was original in that house was removed and replaced by us down to the electrical covers, the floor trim, doorknobs, everything.

[51]  Tr., Docket # 113 (Testimony of Howie-Cox) at 2, 111-112.

[52]  *Id.* at 111-112.

Regarding the $105,750.00 Second Mortgage loan Transaction, Howie-Cox denied that she told Doyle that the reason she wanted to refinance the First Mortgage was to get a lower interest, fixed-rate loan.[53] Howie-Cox also denied that Doyle left the closing without signing the Second Mortgage.[54] She also denied that either she or her husband forged Doyle's signature on the Second Mortgage.[55] Finally, she denied that she had forged Doyle's signature on the back of the $13,524.60 loan-proceeds check, which was mailed to the Crossman Property after the closing of the Second Mortgage.[56] Howie-Cox testified that she saw Doyle sign the Second Mortgage.[57] Howie-Cox testified that the same notary appeared at the closing of the Second Mortgage as did at the closing of the First Mortgage, and that this notary followed the same protocol for witnessing the signatures of Doyle, Jerry Cox, and herself at both closings.[58] According to Howie-Cox, the notary asked to see, and did see, the drivers licenses of all of the parties signing the First Mortgage and the Second Mortgage, including Doyle.[59]

### C. The Court's further findings and conclusions regarding the Transactions.

The Court finds that all five of the Transactions involved only gifts from Doyle to Howie-Cox. None of the Transactions involved any loan. The Court further finds that Howie-Cox

---

[53] *Id.* at 15-16.

[54] *Id.* at 15-17.

[55] *Id.* at 17.

[56] *Id.* at 19-20.

[57] *Id.* at 123.

[58] *Id.* at 124.

[59] *Id.*

13

committed no fraud against Doyle, nor did Howie-Cox willfully and maliciously injure Doyle or any property of Doyle's. And the Court finds that Howie-Cox owes no debt to Doyle.

### 1. Transactions 1 and 2

The Court finds that Transaction 1 and Transaction 2, in which Doyle transferred $12,000.00 and $2,000.00 to Howie-Cox on September 19, 2002 and September 26, 2002, respectively, were not loans, but rather were gifts. Howie-Cox did ask Doyle for this money, but both she and Doyle understood that these were gifts from Doyle, rather than loans to be repaid by Howie-Cox. Howie-Cox never promised, represented, or agreed that she would repay any of this total of $14,000.00 to Doyle.

In making these findings, the Court credits the testimony of Howie-Cox, and finds that the contrary testimony of Doyle is not credible. And Doyle presented no documentation, or any other form of evidence, to corroborate her testimony that these were loans rather than gifts. No documentation of these alleged loans was created or signed by either of the parties.

Other evidence that supports the Court's findings regarding Transactions 1 and 2 include the following:

- Doyle testified that Howie-Cox requested the first alleged loan of $12,000.00 by leaving Doyle a handwritten note, asking to borrow the money. At trial Doyle testified that she had kept this note, but she also admitted that she did not bring it to trial.[60] If this note exists and is favorable to Doyle, as Doyle says, the Court would have expected Doyle to present this note as evidence, but she did not. This tends to support Howie-Cox's testimony that she did not write Doyle any such note asking to borrow $12,000.00. And this tends to undermine Doyle's version of events.

- On cross-examination, Doyle admitted that when she made what she claims was the $14,000.00 in loans to Howie-Cox, Doyle knew that the personal and financial situation of Howie-Cox was such that there was a significant risk that the loan would

---

[60] *See* Tr., Docket # 107, at 78-79.

14

not be repaid — in Doyle's words, "[i]t was very risky." But Doyle says that she made the purported loans anyway, because "she's family."[61] This tends to support the Court's finding that this was a gift, not a loan that Doyle expected to be repaid.

- Under Doyle's version of events, the total of $14,000.00 in loans she made to Howie-Cox in 2002 would become due for repayment when Howie-Cox finished her schooling and obtained full-time employment. Doyle admitted that by the time Transaction 3 (the purchase of the Crossman Property) occurred in March 2004, Howie-Cox had finished school and obtained full-time employment, so that the $14,000.00 in alleged loans had become due. Yet Doyle admitted that she did not at that time demand repayment of the alleged loans, either in full or in installments. Instead, she says, she did not demand repayment at that time because she wanted to give Howie-Cox time to "get on her feet," and because "she was family."[62] This tends to support Howie-Cox's version of events, that the $14,000.00 was a gift, given by one family member to another, rather than a loan that had to be repaid.

- The points made below regarding the other Transactions, including evidence from which the Court finds that Doyle testified falsely at trial, undermine Doyle's credibility and claim that the $14,000.00 was loaned to Howie-Cox, rather than given as a gift.

### 2. Transaction 3

The Court finds that Transaction 3 — the alleged loan by Doyle of just under $50,000.00 to Howie-Cox on or about March 29, 2004, to enable Howie-Cox to purchase the Crossman Property — also was a gift, and was not in any part a loan to Howie-Cox. The Court credits the testimony of Howie-Cox that this was a gift and not a loan; and the Court finds that Doyle's contrary testimony is not credible. The evidence that supports these findings includes the following:

- Doyle hired her own attorney for this Transaction (Howie-Cox was not represented by an attorney), and Doyle's attorney prepared the deed by which Howie-Cox and Doyle became joint owners of the Crossman Property. Despite Doyle's use of her own attorney in this Transaction, there is no documentation tending to show that there was

---

[61] *Id.* at 85.

[62] *Id.* at 79, 81-83, 103-104.

any loan by Doyle to Howie-Cox, or any agreed obligation by Howie-Cox to pay back any part of the $49,961.61 that Doyle supplied to Howie-Cox to enable her to close the purchase of the Crossman Property. For example, there is no promissory note or written loan agreement. Nor is there a mortgage, which would have secured repayment of any loan made by Doyle. Rather, the only evidence that this Transaction involved a loan by Doyle, rather than a gift, is Doyle's own testimony. As noted above, the Court finds that such testimony is not credible.

- Doyle's attorney drafted a deed that gave Howie-Cox and Doyle ownership of the Crossman Property as "joint tenants with full right of survivorship." The Court finds that this inclusion of Doyle in the deed does *not* tend to prove that Doyle made any loan to Howie-Cox. As Doyle's attorney who drafted this deed no doubt knew, this deed gave Doyle no recourse or remedy whatsoever if Howie-Cox failed to repay the alleged $49,961.61 *loan* to Doyle. The deed obviously was not intended by Doyle, and her attorney who drafted it, as a form of security for any loan by Doyle to Howie-Cox. Rather, Doyle had a different purpose, as discussed below.

- Sharon Howie, who is Doyle's sister and Howie-Cox's mother, testified that after the initial purchase of the Crossman Property she and others were at the house when someone said to Doyle that it was nice of her to lend Howie-Cox the money to buy the house. In response, Doyle said **"oh no, it's not a loan, it's a gift from the Jim Hadyniak Foundation**. Uncle Jim would be happy to see the kids in this house."[63] The Court credits this testimony.

- Howie-Cox's father, Thomas Howie, testified that Doyle told him that the money she gave Howie-Cox to buy the Crossman Property **was *not* a loan, but rather was a "gift, from the Jim Hadyniak Fund."** The first time Thomas Howie says he ever heard Doyle allege that this was a loan, rather than a gift, was when this adversary proceeding was filed by Doyle in 2011, seven years after the fact. Howie always believed this to have been a gift.[64] The Court credits Thomas Howie's testimony.

- Jerry Cox, Howie-Cox's ex-husband and Doyle's ex-paramour, testified that Doyle never indicated to him that the money she provided to Howie-Cox for the purchase of the Crossman Property was a loan ("absolutely not"); and that Doyle said quite a few times that this money was "courtesy of the Jim Hadyniak Fund."[65] The Court credits this testimony.

---

[63] Tr., Docket # 117, at 67 (emphasis added).

[64] *Id.* at 97-98 (emphasis added).

[65] Tr., Docket # 118, at 50.

16

- Doyle sat through trial and heard Sharon Howie, Thomas Howie, and Jerry Cox all testify that Doyle told them that the money she gave for the purchase of the Crossman Property was a gift and not a loan. After hearing this testimony, Doyle could have testified in her rebuttal case and denied that she had said these things, *if* she disputed that she said these things. But she did not. She never denied that she said these things. These admissions by Doyle greatly damage her case.

- Doyle's giving the money to Howie-Cox to purchase the Crossman Property as a gift, rather than as a loan, is fully consistent with the general pattern of Doyle's behavior, in which over several years Doyle gave numerous gifts to Howie-Cox, Jerry Cox, and their children, and often babysat their children without charge. The gifts were numerous and often expensive, and at the time Doyle had the means to give such gifts, including the gift of $49,961.61 for the purchase of the Crossman Property. Doyle had such means from the money she inherited from her uncle James Hadyniak several years earlier, in the original amount of $850,000.00 - $1,000,000.00.

- This extensive gift-giving by Doyle, including the gift of the money to purchase the Crossman Property, is fully consistent with the fact that for many years until their estrangement in 2006, Doyle and Howie-Cox had a very close relationship — more like mother and daughter than like aunt and niece.

- Considering all of the evidence and circumstances, including the wording of the deed by which Howie-Cox acquired the Crossman Property with Doyle, the Court finds that Doyle's intention in this Transaction was to give Howie-Cox a gift of the Crossman Property, including the right by Howie-Cox and her family to reside in that property, make whatever improvements they wanted to make, and for the property to fully belong to Howie-Cox, subject *only* to the limitation that in the unlikely event that Howie-Cox predeceased Doyle (Doyle is 17 years older than Howie-Cox),[66] then Doyle would become the sole owner of the Crossman Property, rather than Jerry Cox or any of his children.

**3. The fourth Transaction – the First Mortgage loan against the Crossman Property**

After Howie-Cox bought the Crossman Property on March 29, 2004, with the assistance

of Doyle's gift of $49,961.61, the Crossman Property was not encumbered by any mortgage.

Howie-Cox then borrowed $70,000.00 against the Crossman Property on July 26, 2005, with a

---

[66] At the time of trial, Doyle was 49 years old, and Howie-Cox was 32 years old. (Tr., Docket # 107 (Doyle testimony) at 72, Tr., Docket # 113 (Howie-Cox testimony) at 96).

mortgage loan from Quicken Loans, Inc. Howie-Cox was the only borrower on the promissory note for this loan.[67] There is no evidence that Doyle, nominally a joint owner of the Crossman Property with Howie-Cox, signed any note or loan agreement, or otherwise was ever personally liable to Quicken Loans on this mortgage loan. To the contrary, only Howie-Cox was personally liable for this loan. To secure payment of the loan to Quicken Loans, Howie-Cox gave a mortgage on the Crossman Property. Howie-Cox, Jerry Cox as her husband, and Doyle, as nominal joint owner of the Crossman Property, all signed the mortgage.[68]

Doyle alleges that she was fraudulently induced by Howie-Cox to sign this mortgage, by Howie-Cox's promise and representation that she would use the proceeds from this mortgage loan to repay Doyle the roughly $64,000.00 in loans that Doyle had allegedly given (*i.e.*, the total of the alleged loans in Transactions 1, 2, and 3, discussed above). Howie-Cox denies this, and of course denies that Doyle had previously made any loans to her.

As the closing statement for this $70,000.00 mortgage loan shows, the net proceeds of the loan, after payment of closing costs and real estate taxes then owing, all went to or for the benefit of Howie-Cox, in the form of $7,144.00 disbursed to pay balances on three of Howie-Cox's credit cards, and the $57,785.08 check that was made payable to Doyle and Howie-Cox.[69] It is undisputed that this check was mailed by the mortgage company to the Crossman Property after the closing. Doyle alleges that Howie-Cox forged her endorsement on this check in order to obtain all of the funds. Howie-Cox denies this; rather, she says, at Howie-Cox's request, Doyle

---

[67] DX-C.

[68] JX-EE.

[69] JX-FF at Closing Statements lines 1501-1503, 1604; PX-32.

came to the Crossman Property and endorsed the check in the driveway, leaving it with Howie-Cox.[70]  Howie-Cox kept and used all of the proceeds of this check, because, she says, the purpose of this mortgage loan was to help her financially, and to help her repay some of the debt she and her husband had from making improvements to the Crossman Property to make it habitable, and to make further improvements to the Property.  Howie-Cox denies making any false representations to Doyle regarding this mortgage loan transaction.

The Court finds in favor of Howie-Cox and against Doyle with respect to the parties' conflicting versions of this First Mortgage Transaction.  The Court has already found that there were no prior loans to be repaid by Howie-Cox, in Transactions 1-3.  This undermines Doyle's version of why she agreed to sign the First Mortgage as part of the $70,000.00 mortgage loan. And Doyle admitted on cross-examination that she attended the July 26, 2005 closing of the First Mortgage loan, and signed the First Mortgage at that time.[71]  Doyle also admitted that she did not see, or ask to see, the closing statement to learn how the mortgage loan proceeds were being disbursed.  And she admits that she did not ask anyone at the closing anything about how and when she was to be repaid any of the money Howie-Cox allegedly owed her from prior loans, out of the proceeds of the mortgage loan closing.[72]

The Court finds that Doyle had no expectation or agreement with Howie-Cox that Doyle would receive any proceeds from the First Mortgage Transaction.[73]  Rather, Doyle understood

[70] Tr., Docket # 113, at 111-112.

[71] Tr., Docket # 107, at 139.

[72] Tr., Docket # 107, at 133-34.

[73] In addition to Howie-Cox's testimony to this effect, Jerry Cox testified that he saw Doyle sign the First Mortgage at the closing; that the purpose of the mortgage loan was as Howie-Cox testified; and

19

that the proceeds of that mortgage loan were to benefit Howie-Cox only, and indirectly, to benefit

Jerry Cox, who was Doyle's paramour at the time. The Court further finds that Doyle had no

problem with this at the time, because she already considered herself to have made a complete

gift of the Crossman Property to Howie-Cox, subject only to Doyle's right of survivorship in the

Property in the unlikely event that Howie-Cox predeceased her. At the time of this transaction,

Doyle consented to the Crossman Property being encumbered by a $70,000.00 mortgage loan,

and to Howie-Cox receiving all of the benefit and proceeds from such loan. And such consent

was not based upon any representation or promise made by Howie-Cox.

The Court further finds that Doyle knowingly and willingly endorsed the $57,785.08

proceeds check, and allowed Howie-Cox to retain those proceeds from the mortgage loan, as

Howie-Cox testified. Contrary to Doyle's testimony, the Court finds that Doyle's endorsement

on that check was *not* forged by Howie-Cox or anyone else.

The Court notes that the secret affair between Doyle and Jerry Cox was going on at the

time of the First Mortgage closing in July 2005. Because of this affair, Doyle was even more

disposed than before to be generous in her gift-giving to Howie-Cox, and indirectly thereby, to

Jerry Cox.

### 4. The fifth Transaction – the June 6, 2006 Second Mortgage loan

The Second Mortgage Loan Transaction closed on June 6, 2006. In that transaction,

Howie-Cox received a loan in the total amount of $105,750.00 from Quicken Loans Inc., secured

---

that Doyle did not demand any payment for alleged prior loans out of the proceeds of this mortgage loan.
(Tr., Docket # 118, at 57-61).

by a mortgage on the Crossman Property.  This mortgage was signed on June 6, 2006,[74] by

Howie-Cox and her husband Jerry Cox.  The mortgage also appears to bear the signature of

Doyle, although as noted previously, Doyle denies having signed this mortgage.

As the closing statement for this loan shows, the net proceeds of the loan went first to pay

off the First Mortgage loan, in the amount of $69,955.54.  The remaining proceeds all went to or

for the benefit of Howie-Cox, in the form of $16,152.00 disbursed to pay off the balances on five

of Howie-Cox's credit cards, plus $13,524.60 that was disbursed by a check made payable to

Doyle and Howie-Cox.[75]

Doyle testified that she did not sign the mortgage.  Rather, she says, she came to the

scheduled closing on June 6, 2006, at the Crossman Property, and was told by Howie-Cox that

the purpose of this loan was simply to refinance the first mortgage and to obtain a lower, fixed

rate mortgage, to replace the flexible rate First Mortgage loan.  But at the closing, Doyle says,

she learned that the proposed new loan involved not only paying off the First Mortgage loan, but

also encumbering the Crossman Property with an additional $35,000 in debt.  When she learned

this, Doyle says, she refused to sign the mortgage, and left the loan closing.  Doyle testified that

she learned only about two months later that someone had signed her name to the mortgage,

which had then been recorded, all without her knowledge or authorization.  Doyle further claims

that she did not know about the $13,524.60 check from the loan, and that she never endorsed that

check or received any proceeds from it.

---

[74] JX-GG.

[75] JX-HH (closing statement); PX-26, page 2 (the check).

Howie-Cox testified, in direct conflict with Doyle, that Doyle *did* sign the mortgage on June 6, 2006, at the loan closing at the Crossman Property, and that she saw Doyle sign the mortgage. Howie-Cox also denied having forged Doyle's endorsement on the $13,524.60 proceeds check.[76]

The Court finds in favor of Howie-Cox and against Doyle with respect to the parties' conflicting versions of this Second Mortgage Transaction. Evidence supporting Howie-Cox's version, which the Court finds persuasive, includes the following.

First, the Court finds Howie-Cox to be a credible witness, and finds that Doyle is not a credible witness. The Court's previous discussion and findings, regarding the four Transactions that preceded the June 6, 2006 Transaction, demonstrate that Doyle is not credible. The Court's findings above necessarily mean that Doyle did not testify truthfully at trial in several important respects.

Second, Jerry Cox testified that he attended the closing of the Second Mortgage loan Transaction, and that he too saw Doyle sign the mortgage at that time, and place her initials on each page of the Mortgage.[77]

Third, the notary who attended the closing of the Second Mortgage loan on June 6, 2006, Hana Alazazi, was the same notary who conducted the closing of the First Mortgage loan Transaction. Both mortgage loan closings were held at the Crossman Property, and both were attended by the very same people — the notary Alazazi; Howie-Cox; Doyle; and Jerry Cox. Alazazi testified that at the June 6, 2006 closing, she required the signing parties, including

---

[76] Tr., Docket # 113, at 17-20, 112-113, 123.

[77] Tr., Docket # 118, at 66, 68, 70.

22

Doyle, to show identification to prove their identity, and that Alazazi personally saw Doyle sign the Second Mortgage.[78]  And Alazazi notarized the acknowledgment on the last page of the Mortgage, indicating that Doyle, as well as Howie-Cox and Jerry Cox, signed and acknowledged the mortgage.[79]  In addition, Alazazi testified that she had each of the signing parties, including Doyle, write their initials on the bottom right hand corner of each page of the mortgage.  Such initials appear on each page of the mortgage, and Alazazi identified the initials "PMD" on each such page as having been placed there by Doyle at the closing.[80]

Alazazi testified that although she has conducted thousands of loan closings, she remembers this one in particular because she was later questioned by the police about it, after Doyle filed a complaint alleging that her signature had been forged on the mortgage, in August 2006 (discussed below).  Alazazi testified that in her entire time as a notary, this is the only time such a thing ever happened.[81]

The Court credits and gives great weight to the testimony of Alazazi — she has no apparent motive for testifying falsely about this subject.  Alazazi has had no connections with, or interactions with, any of the three parties who signed the mortgage, including Doyle, other than in her role as notary hired by Quicken Loans, Inc. to attend these two mortgage loan closings.[82] Alazazi also testified that under her arrangement with Quicken Loans, she would have been paid

---

[78] Tr., Docket # 118, at 25-30.

[79] *Id.* at 26-27; JX-GG.

[80] Tr., Docket # 118, at 34, 40-41.

[81] *Id.* at 14-15.

[82] *Id.* at 31-32.

the same amount for attending the closing of the Second Mortgage loan, even if that closing had not been completed because of Doyle refusing to sign the mortgage.[83]  There is no reason apparent to from the evidence why Alazazi would have falsely notarized Doyle's signature on the mortgage, if in fact Doyle had not signed the mortgage.

Of the witnesses presented at trial, Alazazi is the only witness who had no personal involvement in any of the family turmoil in this case.  The Court believes Alazazi's testimony. That necessarily means that Doyle testified falsely at trial, when she denied signing the Second Mortgage at the June 6, 2006 closing.[84]

---

[83] *Id*. at 13, 31.

[84] The Court finds that Doyle also testified falsely at trial when she testified that later on the day of June 6, 2006 loan closing, she went to the car wash run by the family, and had an argument with several family members who urged her to sign the Second Mortgage — Howie-Cox, Sharon Howie, Thomas Howie, and Doyle's then-husband, Bruce Doyle.  (Tr., Docket # 107, at 56-58.)  Bruce Doyle testified to recalling this event, and he also said that Thomas Howie and Doyle's father, Nick Hadyniak, were arguing about this at the car wash (Tr., Docket # 117, at 21, 28-30).  Bruce Doyle admitted, however, that he has no personal knowledge of whether or when Pamela Doyle actually signed the Second Mortgage, and does not recall the actual date of the argument in the car wash, and does not know whether that argument occurred on the date of the loan closing, or at some other time. (*Id*. at 36-37, 44-45, 46).  And Bruce Doyle admitted the possibility that the argument he says he saw happened after Pamela Doyle had signed the Second Mortgage papers, and that at the time she was trying to "renege" on them:

> Q: And isn't it true that she could have been reneging on the fact that she already signed the documents?
>
> A: I have no idea.

(*Id*. at 46-47).  The Court gives no weight to Bruce Doyle's testimony.

Howie-Cox disputed Pamela Doyle's testimony about the argument in the car wash (Tr., Docket # 118, at 94), and of the other parties allegedly present at the car wash that day, none of them support Doyle's version of events.  Sharon Howie testified that only she and Pamela Doyle were at the car wash on the June 6, 2006 date of the Second Mortgage closing, and that they did not have any argument.  (Tr., Docket # 117, at 51-52).  Thomas Howie did not recall any such argument at the car wash.  (*Id*. at 93).  Nick Hadyniak did not testify.

The Court finds that Doyle knowingly and voluntarily signed the Second Mortgage at the June 6, 2006 loan closing, and that she did so knowing that Howie-Cox was taking another $35,000 of equity out of the Crossman Property, with Howie-Cox receiving all of the benefit and proceeds from this loan. Doyle was not at any time personally liable for this Second Mortgage loan, but she did agree to allow Howie-Cox directly, and Jerry Cox indirectly, to obtain all of the financial benefit from this Second Mortgage loan, at the cost of further encumbering the Crossman Property. This was simply the latest, and perhaps the last, of the many substantial gifts that Doyle gave to her niece Howie-Cox, and to her paramour Jerry Cox.[85] And consistent with these findings, the Court finds that Doyle has failed to meet her burden of proving, by a preponderance of the evidence, that Howie-Cox or anyone else forged Doyle's endorsement on the $13,524.60 proceeds check from this Second Mortgage loan.

In August 2006, Doyle first alleged that her signature had been forged on the Second Mortgage. This was two months after the loan closing. And this was soon after Jerry Cox had broken off his affair with Doyle, and announced to Doyle his intention to try to remain in his marriage to Howie-Cox. It was also soon after Howie-Cox had learned of the affair and ended all relations with Doyle. These circumstances suggest, and the Court finds, based on the credible evidence at trial, that Doyle's charges beginning in August 2006 that her name had been forged on the Second Mortgage were untrue, and were motivated by anger against Jerry Cox and Howie-Cox. Such anger resulted from Jerry Cox having ended the affair with Doyle; Howie-Cox having

---

[85] Doyle testified that her affair with Jerry Cox ended shortly *before* the June 6, 2006 Second Mortgage closing. But Jerry Cox testified that the affair was still going on as of the June 6, 2006 loan closing, and did not end until shortly before August 2006. (*See* Tr., Docket # 107, at 126-77, 150 (Doyle); Tr., Docket # 118, at 70-71 (Cox).) The Court finds Cox's testimony to be more credible on this point, and finds that the affair did not end until *after* the June 6, 2006 loan closing.

broken off relations with Doyle; and everyone in the family having learned about the affair and having turned against Doyle.

These conclusions are further bolstered by the following testimony that Doyle gave at trial, when she was asked about her affair with Jerry Cox and why she brought this lawsuit against her own niece:

> Q:  So when you look back at things now, how do you feel about the affair?
> . . .
>
> THE WITNESS:  Not good at all. I'm disgusted at myself. It's been really hard on me dealing with the emotions and feelings and -- that go along with it. I have a lot of -- the other thing, I have a lot of trust issues, suspicions of people around me so much so that it became a factor of -- became part of the reason for my second divorce.  I've had breakdowns. I've had sick leaves from work, a lot of hardships, a lot of emotions, a lot of frustration.
>
> Q:  Has the -- what has the affair done with the relationship between you and your family?
>
> A:  It's destroyed. It's affected, like I said, my latest ex-husband, my relationship with the rest of my family, with my daughters.
>
> Q:  Did you want to bring this lawsuit?
>
> A:  No. I wouldn't want -- no. I had -- it's just -- no.  Family doesn't treat family like that. It came to me having no choice. **I am totally in despair and devastated. I am alone, but it seems like the other parties all involved are just merrily going on their way seeming to, you know, just fare along just fine.**[86]

---

[86]  Tr., Docket # 107, at 65-66 (emphasis added).

**5. Conclusion regarding the five Transactions**

Based on the Court's findings and discussion above, the Court concludes that Howie-Cox owes no debt to Doyle, based on any alleged loans or any alleged fraud, or based on any other ground. Doyle is not a creditor of Howie-Cox.

**D. The nondischargeability counts in the amended complaint**

Doyle seeks a determination that all of the debts allegedly owed to her by Howie-Cox are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). But the Court has found that the transfers to Howie-Cox on account of the Transactions were gifts, not loans, and that Howie-Cox owes no debt to Doyle. That determination is dispositive of all of the dischargeability counts in the amended complaint. Because there is no debt, §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) do not apply. The Court will enter a judgment in favor of Howie-Cox and against Doyle on all of the dischargeability counts in Doyle's amended complaint.

**E. Doyle's objections to Howie-Cox's discharge**

In her amended complaint, Doyle also seeks a denial of Howie-Cox's discharge, based on 11 U.S.C. §§ 727(a)(4)(A) and 727(a)(5). Because there is no debt owing to Doyle from Howie-Cox, however, Doyle is not a creditor in Howie-Cox's bankruptcy case.

Because of this, Doyle does not have standing to object to Howie-Cox's discharge. *See* 11 U.S.C. § 727(c)(1)(listing parties who may object to discharge as "[t]he trustee, a creditor, or the United States trustee"); *Stanley v. Vahlsing* (*In re Vahlsing*), 829 F.2d 565, 567 (5th Cir. 1987)(relying on *In re Chandler*, 138 F. 637 (7th Cir. 1905))("[A] party whose claim has been conclusively disproved cannot object to a debtor's discharge. Only those creditors who have claims that will be affected by the discharge can file objections."); *Bishara v. O'Callaghan* (*In re*

*O'Callaghan*), 304 B.R. 500, 511 (Bankr. M.D. Fla. 2003)(relying on *Adams Farms v. James* (*In re James*), 166 B.R. 181, 183-84 (Bankr. M.D. Fla. 1994)(party whose claim is disallowed no longer has standing to object to discharge); *Hovanesian & Hovanesian* (*In re Ernst*), No. CC-04-1052-McBMa, 2005 WL 6960227, at *6 (B.A.P. 9th Cir. November 21, 2005)(citing *Vahlsing*, 829 F.2d at 567)("In order to file an objection to a debtor's discharge, a creditor must have a claim that will be affected by the debtor's discharge."); *Cardwell v. Finnimore (In re Finnimore)*, No. 10-3036, 2012 WL 1392992, at *4 (Bankr. D. Conn. April 20, 2012)(citing *Vahlsing*, 829 F.2d at 567)("[A] holder of a disputed claim is a 'creditor' within the purview of Section 727(c) and has Section 727 standing unless the invalidity of the claim has been conclusively determined."); *see also Mapley v. Mapley* (*In re Mapley*), 437 B.R. 225, 228-29 (Bankr. E.D. Mich. 2010)(a creditor (or alleged creditor) "does not have standing to object to the Debtor's discharge solely on behalf of *other* creditors.")(citation omitted, italics in original).

For these reasons, the Court will enter a judgment for Howie-Cox on all of Doyle's objections to Howie-Cox's discharge.

### F.  Section 523(d)

Plaintiff's Amended Complaint includes as one of its five counts (Count I) a count seeking a determination that Howie-Cox's alleged debts to Doyle arising from Transactions 1-4 is nondischargeable, based on 11 U.S.C. § 523(a)(2)(A).  Even though Howie-Cox has prevailed on that claim, the Court will not award her any costs or attorney fees under 11 U.S.C. § 523(d). That section states:

> If a creditor requests a determination of dischargeability of a consumer
> debt under subsection (a)(2) of this section, and such debt is discharged,
> the court shall grant judgment in favor of the debtor for the costs of, and a
> reasonable attorney's fee for, the proceeding if the court finds that the

28

position of the creditor was not substantially justified, except that the court
shall not award such costs and fees if special circumstances would make
the award unjust.

The Court concludes that § 523(d) does not apply. The Court has determined that Doyle is not a "creditor" of Howie-Cox, and no debt, let alone a "consumer debt," of Howie-Cox to Doyle exists. So no such debt "is discharged." For these reasons, § 523(d) does not apply.

Even if that section did apply, however, the Court would decline to award any costs or attorney fees under § 523(d) in favor of Howie-Cox, because "special circumstances would make the award unjust." Such circumstances include the following. First, Doyle's § 523(a)(2) claim was only part of the § 523(a) and § 727(a) claims pursued by Doyle in this adversary proceeding. Second, the Court finds that Doyle does not have the financial ability to pay any substantial award of costs or attorney fees. This is based on the undisputed evidence presented at trial regarding Doyle's current financial circumstances, including the fact that the money she inherited from Jim Hadyniak is long gone. Third, Howie-Cox has not incurred and will not have to pay any attorney fees for the defense of this adversary proceeding. This is because her attorney represented her on a *pro bono* basis, under the Court's *pro bono* program. Fourth and finally, a § 523(d) award in favor of Howie-Cox and against Doyle might lead to further litigation and legal entanglement between these estranged family members — which this Court believes is the last thing this family needs.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter judgment for Defendant Stephanie Howie-Cox on all counts of Plaintiff Pamela Doyle's Amended Complaint.

**Signed on June 30, 2014**                    /s/ Thomas J. Tucker
                                               **Thomas J. Tucker**
                                               **United States Bankruptcy Judge**